

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-9-2004

# Storey v. Burns Intl Security

Precedential or Non-Precedential: Precedential

Docket No. 03-2246

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"Storey v. Burns Intl Security" (2004). *2004 Decisions.* Paper 22.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/22

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No: 03-2246

CURTIS BLAINE STOREY,

Appellant

v.

BURNS INTERNATIONAL SECURITY SERVICES

Appeal from the United States District Court
for the Western District of Pennsylvania
(Civil Action No. 02-cv-00621)
District Judge: Hon. David S. Cercone

Argued: February 9, 2004

(Filed: December 9, 2004)

Before: SCIRICA, Chief Judge, and ROTH and McKEE,
Circuit Judges.

KIRK D. LYONS (argued)
Southern Legal Resources Center
P.O. Box 1235
1114 Montreat Road, Suite #1
Black Mountain, NC 28711

1

Attorney for Appellant

FRED G. PRESSLEY, JR.
JOHN M. STEPHEN (argued)
Porter, Wright, Morris & Arthur
41 South Street, 29th Floor
Columbus, OH 43215
Attorneys for Appellee

OPINION OF THE COURT

McKEE, Circuit Judge.

Curtis Blaine Storey, a former employee of Burns International Security Services, filed this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, alleging that Burns discharged him because of his national origin and religion. The "national origin" claim is based on his self-proclaimed identity as a "Confederate Southern-American" and his display of the Confederate battle flag in the workplace. As we explain below, his religion claim arises from the same claimed identity, and the design of the Confederate flag. The district court granted Burns' motion to dismiss based upon that court's conclusion that Storey did not claim to be a member of a class protected under Title VII, and because the record failed to support any claim of religious discrimination. However, we need not address the delicate intricacies of the merits of either claim because we conclude that Storey does not claim to have suffered an "adverse employment action" within the meaning of Title VII. Accordingly, he fails to state a claim upon which relief can be granted, and we will therefore affirm the district

2

court's dismissal of his complaint.[1]

## I. Background

Until April 30, 2001, Storey was employed as a security guard at the Sony plant located in Newton Station, Pennsylvania. He had worked as a security guard for more than ten years, but only became an employee of Burns in January 2001, when Burns purchased the company that previously employed him. App. 28 (Complaint ¶ 8).

In August 1998, Storey placed a 2½" by 2½" Confederate flag sticker on his lunch box, and put two Confederate flag bumper stickers on his pickup truck. One bumper sticker included the slogan, "The South Was Right," and the other proclaimed, "Heritage not Hate." App. 29 (Complaint ¶ 9).

Later, Jason Schneider and Tim Pratt, two of his supervisors at Burns, told Story that Burns was about to implement a "diversified hiring program," and that Storey would have to remove his Confederate flag stickers. When Storey refused, they explained that Sony and Burns had a "zero tolerance" policy with respect to the display of Confederate symbols. App. 29 (Complaint ¶ 11).

---

[1] An appellate court may affirm a result reached by the district court for reasons that differ from the conclusions of the district court if the record supports the judgment. *Guthrie v. Lady Jane Collieries, Inc.*, 722 F.2d 1141, 1145 n. 1 (3d Cir.1983).

Storey was subsequently ordered to report to Burns headquarters in Pittsburgh, where four unnamed supervisors attempted to convince him to remove or cover his stickers because other employees might be offended by them. Storey responded that, as a Christian, he was offended by things that occurred at work (particularly the use of profanity by other employees), but he accepted it as something he had to deal with. App. 29-30 (Complaint ¶¶ 11-12).

The next day, another Burns employee told Storey that the company had concluded that Storey had voluntarily resigned. Storey stated that he had not resigned and reported to work the following day. However, the guard at the front gate of the plant would not allow Storey to enter the facility, and a captain of the security guards told Storey that he had been terminated because of the Confederate stickers. App. 30 (Complaint ¶ 13).

Storey subsequently filed a discrimination charge with the Equal Employment Opportunity Commission, alleging that Burns terminated him based on his national origin, "Confederate Southern-American" and religion, Christian. App. 34. After conducting an investigation and finding no basis for relief under Title VII, the EEOC issued a "right to sue" letter, and Storey filed the instant claim in federal district court. App. 35. The district court eventually dismissed Storey's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), finding that "Confederate Southern American" did not qualify as a national origin under Title VII, and that Storey had not established that his display of a Confederate flag was essential to maintaining a

4

sincerely held religious belief.  This appeal followed.[2]

We have jurisdiction pursuant to 28 U.S.C. § 1291.  Our review of the district court's dismissal of Storey's complaint is plenary.  "A motion to dismiss pursuant to Rule 12(b)(6) may be granted only if, accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to the plaintiff, plaintiff is not entitled to relief."  *Oatway v. American Intern. Group, Inc*, 325 F.3d 184, 187 (3d Cir. 2003) (citation and internal quotation marks omitted).

## II. Discussion

Title VII prohibits employment discrimination based on national origin[3] or religion.[4]  42 U.S.C. § 2000e-2(a)(1).  As we

---

[2]  Storey also alleged that Burns discriminated against him because of his race.  The district court also dismissed that claim, but it is an issue on appeal.

[3]  "National origin" usually "refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came."  *Espinoza v. Farah Mfg. Co., Inc.*, 414 U.S. 86, 88 (1973).  In come cases, however, courts have been willing to expand the concept of "national origin" to include claims from persons such as cajuns or serbs based upon the unique historical, political and/or social circumstances of a given region. *See Pejic v. Hughes Helicopters,* 840 F.2d 667 (9th Cir. 1988) and *Roach v. Dresser Industrial Valve and Instrument Division*, 494 F. Supp. 215, 218 (D. La. 1980), and

noted at the outset, Storey's Title VII claims stem from his self-proclaimed identity as a "Confederate Southern-American."[5]

---

*Kanaji v. Children's Hospital of Philadelphia*, 276 F. Supp. 2d 399, 401 (E.D. Pa., 2003) .

[4] The term "religion" as used in Title VII includes all aspects of religious observance, practice, and belief in the workplace. 42 U.S.C. § 2000e(j).

[5] Although Storey maintains that his national identity claim arises from his status as a "Confederate Southern-American," it is more realistic and accurate to view his claim as that of a "Confederate White-American." Viewing his claim in that manner does not alter our analysis, but it does allow a more accurate context both for his claim, and for the employer's concerns.

> Symbols can have a practical function; they are not merely aesthetic images. They can be used for strategic social effect–for the easily recognized assertion of political messages. The significance of a governmental symbol is connected to the state and its ethos. One of the Confederacy's key beliefs, as its Constitution readily asserted, was the interminable white man's right to own black slaves. The battle flag of the Confederacy, then, [can be interpreted as] an exclusionary message that stigmatizes blacks as outsiders of the political community.

Alexander Tsesis, *The Problem of Confederate Symbols: A*

6

First, he argues that "Confederate Southern-American" is a valid national origin under Title VII because members of this group share a common culture and history of persecution dating back to the civil war era. App. 29-30 (Complaint ¶¶ 10, 14).[6] Storey also argues that the Confederate flag is a religious symbol because it incorporates the cross of Saint Andrew, a venerated

*Thirteenth Amendment Approach*, 75 Temp. L. Rev. 539, 557 (2002) (footnotes omitted). *See generally* Robert J. Cottrol, *The Long Lingering Shadow: Law, Liberalism, and Cultures of Racial Hierarchy and Identity in the Americas*, 76 Tul. L. Rev. 11 (2001).

[6] In his complaint, Storey states:

> The ancestors of Confederate Southern-Americans have been bequeathed a precious heritage of honor, chivalry and Christian virtues to their descendants. Confederate Southern-Americans bear the scars of a people victimized and nearly destroyed by total war, loss of civil rights, living in 'conquered provinces' under reconstruction and a persecution that continues to the present day. Confederate Southern-Americans endured a persecution similar to that suffered by the Highland Scots under English rule after the Jacobite uprising of 1745, or the Acadians of Canada.

App. 29-30 (Complaint ¶ 10).

religious symbol.[7]  He claims that displaying  that symbol is similar to displaying a traditional cross or the Star of David. App. 31 (Complaint ¶ 15).[8]  However, before addressing the merits of Storey's two claims, we must first determine if he has alleged an "employment action" under Title VII. [9]

Under the familiar  *McDonnell Douglas* burden shifting test,[10] a Title VII plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence.  *Texas Dept. of Community Affairs v. Burdine*, 450

---

[7] St. Andrew's cross is a diagonal or x-shaped cross.  It is also incorporated into the national flag of Scotland.  Peter Williams, *The Biography of St. Andrew, Patron Saint of Scotland* (visited August 30, 2004) <*http://www.britannia.com/bios/saints/andrew.html*>.

[8] Storey also states that the cross on the Confederate flag can be interpreted as the Greek letter "X," an ancient symbol for Christ.  App. 31 (Complaint ¶ 15).

[9] For the sake of argument, we will assume that "Confederate Southern-American" is a valid national origin, and that the Confederate flag has some religious significance for members of this group.

[10] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

U.S. 248, 252-53 (1981).[11]  Although the *prima facie* elements of a discrimination claim vary depending on the particular facts of the case, *Sarullo v. U.S. Postal Service*, 352 F.3d 789, 797-98 (3d Cir. 2003) (per curiam), the plaintiff must generally present evidence that "raises an inference of discrimination." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510 (2002) (citations omitted).  At the pleading stage, however, the plaintiff need only set forth "a short and plain statement of the claim showing that the pleader is entitled to relief" as required by Federal Rule of Civil Procedure Rule 8(a)(2).  *Id.* at 508.

In order to be entitled to relief, a plaintiff must have suffered a cognizable injury. Thus, only a person "claiming to be aggrieved" may bring an action under Title VII.  *See* 42 U.S.C. § 2000e-5.[12]  We have defined "an adverse employment action" under Title VII as an action by an employer that is

---

[11] If the plaintiff is able to establish a *prima facie* case of discrimination, the burden then shifts to the employer to provide a legitimate, nondiscriminatory explanation for the adverse employment action.  Should the employer meet this burden, the plaintiff must then prove by a preponderance of the evidence that the explanation offered by the employer is a pretext for discrimination.  *See Burdine*, 450 U.S. at 253.

[12] Section 2000e-5(b) provides that "a person claiming to be aggrieved" may file a charge with the EEOC.  If the charge is dismissed or the agency does not act within a specified time period, "a civil action may be brought . . . by the person claiming to be aggrieved."  § 2000e-5(f)(1)

"serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001) (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997).

That definition stems from the language of Title VII itself. The statute provides: "It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his *compensation, terms, conditions, or privileges of employment,* because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). An employer's failure to reasonably accommodate an employee's sincerely held religious belief that conflicts with a job requirement can also amount to an adverse employment action unless the employer can demonstrate that such an accommodation would result in "undue hardship." *See Shelton v. University of Medicine & Dentistry of New Jersey*, 223 F.3d 220, 224 (3d Cir. 2000); *see also* 42 U.S.C. § 2000e(j). Storey's complaint fails to meet even these minimal pleading requirements.

Although Storey's complaint speaks of being discharged because of his national origin and religion, Storey concedes that he was fired because he refused to cover or remove his Confederate flag symbols when his employer told him to. App.

10

29 (Complaint ¶¶ 11-13).[13] The record reflects that, had Storey complied, he would not have been terminated. Rather, he would have continued working for Burns as a "Confederate, Southern American" and Christian. Therefore, even if we assume *arguendo* that he is a member of a protected class and if we further accept the claim that the Confederate flag may be viewed as a religious symbol, Storey still has not established a cause of action.

Although Storey attempts to alchemistically spin the discharge into illegal employment discrimination under Title VII, it is clear that he is not alleging that he was discharged because of his claimed national origin or his religion. Moreover, Storey does not argue that the employer was ever aware of the religious symbolism he attaches to the Confederate flag. In fact, before he was terminated, his employer tried to convince him to cover or remove his stickers during work so that he could remain an employee despite his claimed national origin and religion.

Nothing in Storey's complaint suggests that Burns' requirement conflicted with a sincerely held belief that was endemic to his professed national origin or religion claims. By his own account, Storey only "displayed these stickers because he is proud of being a Confederate Southern-American" and "is interested in sharing his passion for his heritage with others,"

---

[13] In fact, Storey alleges the security guard captain told him that "he had been fired because of his stickers." App. 30 (Complaint ¶ 13).

11

App. 29 (Complaint ¶ 9). He does not claim that anything fundamental to his national origin or religion requires display of confederate symbols. His personal need to share his heritage can not be equated with something endemic to national origin or a religiously mandated observance, and he does not argue otherwise. *Compare Swartzentruber v. Gunite Corp.*, 99 F. Supp.2d 976, 978, 979 (granting summary judgment, in part, because plaintiff, a member of the Church of the American Knights of the Ku Klux Klan, failed to submit any evidence that his employer's requirement that he cover up a tattoo depicting a "hooded figure standing in front of a burning cross" conflicted with his religious beliefs), with *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359 (finding that a police department's ban on facial hair was unconstitutional when applied to Sunni Muslim officers because their religion required that they grow beards); and *Protos v. Volkswagen of America, Inc.*, 797 F.2d 129, 134 (3d Cir. 1986) (finding that plaintiff established a *prima facie* case of religious discrimination, in part, because her "religion forbade her to work on Saturdays.").[14]

Accordingly, we will affirm the district court's dismissal of Storey's complaint.[15]

---

[14] We do not suggest that the display of a religious or cultural symbol can never implicate Title VII's ban on religious and national origin discrimination.

[15] In doing so, we note the concerns expressed by Judge Gregory in *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 822-23

### III. Conclusion

Based on the foregoing analysis, we will affirm the district court's dismissal of Storey's complaint pursuant to Rule 12(b)(6).

SCIRICA, *Chief Judge*, Concurring.

I agree with much of the Court's opinion and join in affirming the dismissal of Storey's complaint, but I believe

---

(4th Cir. 2004) (en banc) (Gregory J., concurring). There, Judge Gregory hypothesized that, in an extreme case, display of certain symbols could expose an employer to a hostile work environment claim under Title VII.

Moreover, common sense suggests that such problems are not readily resolved merely because symbols such as a Confederate flag may be accompanied with slogans such as "heritage not hate," because a symbol's significance often lies "in the eye of the beholder."

> [T]o its supporters at the time of its creation as well as some proponents today . . . the Confederate flag undeniably represented, and represents, support for slavery, . . . and opposition to the Republic . . . . . . . . Against this historical backdrop, it becomes more apparent why co-workers might feel offended, harassed and even threatened by the Confederate battle flag in the workplace, even if those who display the flag do so with no ill will.

*Id.* at 824.

Storey's discharge constituted an "adverse employment action." An "adverse employment action" is one that is "'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001) (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)). Termination of employment constitutes an "adverse employment action" for purposes of Title VII. *Abramson v. William Patterson College of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001).

In his complaint, Storey claimed that Burns discharged him because of his national origin and religion in violation of 42 U.S.C. § 2000e-2(a)(1). In seeking damages for lost wages, Storey stated that he "has been fired from his job" as a result of "Defendant's discriminatory actions." On a motion to dismiss, we accept all factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996). Based on this standard, Storey's allegation that he was discharged because of his national origin and religion sets forth an adverse employment action required to state a Title VII claim.

Even so, Storey has failed to state a prima facie case for national origin discrimination under Title VII. To do so, Storey must establish that: (1) "Confederate Southern-American" is a protected national origin classification; (2) he was qualified to perform his job; and (3) he was fired under circumstances that give rise to an inference of unlawful discrimination. *See*

14

*Waldron v. SL Industries, Inc.*, 56 F.3d 491, 494 (3d Cir. 1995) (citing *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). I agree with the District Court that Storey failed to satisfy the first prong because "Confederate Southern-American" is not a legitimate national origin classification for Title VII purposes.

"National origin" refers to the "country where a person was born, or, more broadly, the country from which his or her ancestors came." *Espinoza v. Farah Mfg. Co., Inc.*, 414 U.S. 86, 88 (1973). Following *Espinoza*, the few courts that have considered the issue directly have rejected "national origin" claims based on Confederate or Southern American heritage. *See, e.g., Chaplin v. Du Pont Advance Fiber Sys.*, 293 F. Supp. 2d 622, 628 (E.D. Va. 2003) (finding "Confederate-American" not a protected class under Title VII); *Williams v. Frank*, 757 F. Supp. 112 (D. Mass. 1991) ("Southernness is not a protected trait"). While Storey is correct that neither United States birth nor citizenship necessarily precludes a national origin discrimination claim, it does not follow that "Confederate Southern-American" is a valid national origin class under Title VII. Where one cannot trace ancestry to a nation outside of the United States, a former regional or political group within the United States, such as the Confederacy, does not constitute a basis for a valid national origin classification.[16]

---

[16]Storey contends the Confederate States were "separate, distinct and identifiable in the same way that France or Japan is

For the reasons stated by the Court, Storey also has failed to state a religious discrimination claim under Title VII.[17] As

_____

separate and identifiable for a period of years," and therefore Confederate Southern-American constitutes a "national origin." The Supreme Court has stated the Civil War was "not between independent nations, but between different portions of the same nation." *Dow v. Johnson*, 100 U.S. 158, 164 (1879). *See also*, *Black's Law Dictionary* 1614 (8th ed. 2004) (defining "civil war" as "an internal armed conflict *between people of the same nation*," including "the war from 1861 to 1865") (emphasis added). For an individual whose ancestors' nation of origin existed in North America before the United States, however, a proper national origin classification may be possible. *See, e.g.*, *Dawavendewa v. Salt River Project Agric. Improvement & Power Dist.*, 154 F.3d 1117, 1120 (9th Cir. 1998) ("Because the different Indian tribes were at one time considered nations, and indeed still are to a certain extent, discrimination on the basis of tribal affiliation can give rise to a 'national origin' claim[.]").

[17]To state a prima facie case for religious discrimination under Title VII, Storey must establish the following: he held a bona fide religious belief that conflicted with an employment requirement; he informed the employer of this belief; and he was disciplined for failing to comply with the conflicting employment requirement. *Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 224 (3d Cir. 2000). Once an employee establishes a prima facie case, an employer may defend by demonstrating that it has offered the employee "reasonable accommodation" or that the accommodation sought cannot be

16

the Court notes, Storey failed to state a prima facie case because he failed to inform his employer that he held a religious belief that conflicted with an employment requirement. Specifically, he did not inform his employer that displaying the Confederate flag had any relation to his religious beliefs or observances.[18]

Therefore, I concur in the result.

---

accomplished without undue hardship. *United States v. Bd. of Ed. For Sch. Dist. of Phila*., 911 F.2d 882, 886-87 (3d Cir. 1990).

[18]As the District Court correctly noted, Storey's complaint did not contend that he displayed the stickers for religious reasons, but "because he is proud of being a Confederate Southern-American. He comes from a Southern family, and is interested in sharing his passion for his heritage with others." [JA 3-4]